IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S.R.P. MANAGEMENT CORP. et al. | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | NO.  06-935 |
| | : | |
| SENECA INSURANCE COMPANY | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM OPINION AND**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    May 13, 2008

This is an insurance coverage case brought by plaintiffs Nibur Westmoreland, Inc. ("Nibur")

and S.R.P. Management Corporation ("SRP") (collectively, "Plaintiffs") against defendant Seneca

Insurance Company ("Seneca").  Plaintiffs seek coverage for damages incurred due to a partial roof

collapse of the second floor warehouse ("Second Floor Warehouse") in a vacant portion of the

building located at 3230 North Third Street, Philadelphia, Pennsylvania (the "Building"), owned by

Nibur, managed by SRP, and insured by Seneca.  Plaintiffs contend that the collapse was due to

"hidden decay," a peril that is covered under an exception to the applicable policy exclusion for

damage caused by collapse.  Seneca, by contrast, contends that the damage is not covered under the

collapse exclusion in that the decay that caused the collapse was not "hidden."

Prior to trial, the parties stipulated to damages, allowing the case to proceed on the liability

issue alone.  This Court presided over a non-jury trial on March 17 and 18, 2008.  Counsel have

submitted proposed findings of fact, conclusions of law, and supporting briefs.  The case is now

ready for resolution.

I.      FACTUAL BACKGROUND

        A.      Undisputed Factual Background

        In addition to stipulating to damages, the parties also largely agreed to the underlying factual

background of this case.[1]  We summarize these underlying facts here to give the proper context to

our ultimate decision.

                1.      The Building

         Steven Rubin ("Rubin") owns both Nibur and SRP.  (Joint Stipulation as to Uncontested

Facts, Doc. 30, § I.A ["Joint Stip."] ¶¶ 1-2.)  He also owns more than forty buildings in and around

the City of Philadelphia, comprising more than two million square feet of space.  (N.T. 3/17/08 at

24, 30.)  His father purchased this property in 1992, and he inherited Nibur and SRP from his father

in 1996.  (Joint Stip. ¶¶ 3-4.)[2]

        The Building, constructed during the 1920s and previously used for many years as a knitting

mill, is U-shaped and contains approximately 100,000 square feet of internal space.  (Joint Stip. ¶

5; N.T. 3/17/08 at 24-25.)  It extends much of the length of Third Street between Allegheny Avenue

and Westmoreland Streets, with Westmoreland Street bounding the Building's north side, and

Allegheny Avenue bounding its south side.  (Joint Stip. ¶ 6.)

        The City of Philadelphia operates a child care center in a substantial portion of the first floor

_____

        [1]While we set out this summary as undisputed, the parties are advised that they are to
construe this summary to constitute factual findings to the extent we have misconstrued any
aspects of their agreement.

        [2]It appears that the joint stipulation concerning how ownership of the Building passed
from Rubin's father to him is incomplete in that it fails to address how ownership of the Building
passed from Rubin's father to Nibur.  It is not disputed, however, that Rubin controlled both
Nibur and SRP at all times relevant to this case.

of one section of the Building.  (N.T. 3/17/08 at 25-26, 35.)  The second (uppermost) floor of that

portion of the Building is vacant.  The collapse occurred in the attached Second Floor Warehouse,

another portion of the Building that was also vacant.  (Joint Stip. ¶¶ 7, 17; N.T. 3/17/08 at 25-26.)

## 2.      The Insurance Policy

Seneca issued property insurance policy No. ESP1500187 (the "Policy") to Plaintiffs,[3] among

other named insureds; the Policy covered the Building, among other properties.  (Joint Stip. ¶ 29;

Ex. D218-D221.)  A complete copy of the Policy was introduced by post-trial supplement to the

record, at this Court's invitation, as exhibit D218-D265.[4]  It had a term of September 15, 2005 to

September 15, 2006 and was in effect at the time of the discovery of the loss.  (Joint Stip. ¶ 29; Ex.

D218; N.T. 3/17/08 at 28.)[5]

The Policy extends coverage "for direct physical loss of or damage to Covered Property at

the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."

(Ex. D234.)  "Covered Property" includes the insured "building or structure," and "Covered Cause

of Loss" is defined as "risks of direct physical loss" except as otherwise excluded by the Policy.

---

[3]Although both Nibur and SRP are listed as named insureds under the Policy, we treat
Nibur, the property owner, as the proper plaintiff in this first party property damage case.  (*See*
N.T. 3/17/08 at 116-17.)

[4]Defendant Seneca's exhibits are labeled with the prefix D by page, rather than by
document.

[5]In light of the fact that Plaintiffs were unable to establish the exact date of the collapse
(*see infra* § II.B.1), we recognize that there could have been some dispute as to whether the
Policy, which came into effect only six days before the loss was discovered, might not have been
in effect at the time the collapse actually occurred.  The parties, however, did not raise any
concern over this issue, likely because of evidence that the Policy was on renewal and that
Seneca had provided coverage for several years before the discovery of the loss.  (*See* N.T.
3/17/08 at 78.)

(Exs. D234, D227.)  The Policy excludes coverage for damages "caused by or resulting from . . .

decay, deterioration, hidden or latent defect" as well as "collapse":

        B.    EXCLUSIONS

            2.      We will not pay for loss or damage caused by or resulting from any of the following:

                (d)(1)  Wear and tear;

                   (2)  Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage itself;

                *     *     *

                (k)     Collapse, except as provided below in Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

(Joint Stip. ¶ 30; Ex. D228-D229.)  The Policy provides, however, "Additional Coverage" for

collapse caused by "hidden decay":

        D.    ADDITIONAL COVERAGE–COLLAPSE

            1.      We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

               *     *     *

                b.     Hidden decay;

(Joint Stip. ¶ 31; Ex. D232.)  The Policy further provides that Seneca may, but is not obligated to,

inspect the Building from time to time:

        D.    INSPECTIONS AND SURVEYS

> We have the right but are not obligated to:
> 1.     Make inspections and surveys at any time;
> 2.     Give you reports on the conditions we find; and
> 3.     Recommend changes.
>
> Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged.

(Ex. D224.)

### 3.     The Second Floor Warehouse

The collapse occurred in the portion of the Building known as the Second Floor Warehouse, a room that measures approximately 65 feet in width by 94 feet in length. (Joint Stip. ¶ 8; N.T. 3/17/08 at 121.) The north and south walls are each 94 feet long, and the east and west walls are each 65 feet long. The exterior walls of the Second Floor Warehouse are constructed of brick, and its windows are in-filled with concrete block. (Joint Stip. ¶¶ 9-10.) The Second Floor Warehouse had been vacant for many years prior to the events at issue in this case. (Joint Stip. ¶ 17.)

The roof of the Second Floor Warehouse was gable-shaped with a large monitor/skylight section at the center. (Joint Stip. ¶ 11.)[6] A series of four heavy wooden triangle-shaped constructs, known in the construction field as "trusses," supported the roof. (Joint Stip. ¶ 12; N.T. 3/17/08 at 37, 122-24; N.T. 3/18/08 at 17.)

The term "truss" refers to the entire construct, and each truss is constructed of several constituent parts. (*See* Diagram 1, which is provided for illustration purposes only and does not purport to be to scale. It was prepared by the Court but we believe closely approximates the schematic prepared at trial by Seneca's expert, Russell Daniels, P.E. (Ex. D216.))

---

[6]Sometime after the collapse, Plaintiffs had the remaining trusses removed and replaced the gabled, truss-supported roof with a redesigned and somewhat raised flat roof.



Diagram 1.

Upper Chord –>                                    <– Upper Chord

<–Wall                    ∧ Bottom Chord ∧                    Wall –>

The bottom, and longest leg, of the triangular-shaped truss is a single 65-foot long, 9-inch by 12-inch timber, known as a "bottom chord." (N.T. 3/17/08 at 122.) The bottom chord of each truss ran parallel to the Building's floor and rested in pockets in the Second Floor Warehouse's brick walls. (N.T. 3/17/08 at 122.) Two additional timber beams, known as "upper chords" formed the two upper legs of the triangular-shaped truss. (N.T. 3/18/08 at 37-38.) Each upper chord was bolted to one end of the bottom chord, at a point approximately 12-15 inches out from the brick wall upon which the bottom chord sat. (N.T. 3/17/08 at 122-24; N.T. 3/18/08 at 37-38.) The joint between each upper chord and the bottom chord formed what appears to be a forty-five degree angle. (*See, e.g.*, Ex. D107.) This entire triangular-shaped construct constitutes a truss. (N.T. 3/17/08 at 122-24.)

The roof was supported by a system of four trusses that were situated parallel to the Building's east and west walls and perpendicular to the Building's north and south walls. (Joint Stip. ¶ 12; N.T. 3/17/08 at 119-21.) The ends of each truss ("end sections") extended into or "sat" in pockets in the Building's north and south brick walls. (Joint Stip. ¶ 13.) The pockets were approximately 13-14 inches deep, 9 inches wide, and 12 inches tall, and were located approximately nine feet above the floor of the Second Floor Warehouse. (N.T. 3/17/08 at 119-22, 185-86; N.T. 3/18/08 at 55.)

It was one of these four trusses – the second from the east (Third Street) wall of the Second

Floor Warehouse – that collapsed at its north end, precipitating this litigation. (Joint Stip. ¶¶ 23, 25; N.T. 3/17/08 at 32, 126.) For clarity of reference, we use the term "truss" to refer generally to any of the four trusses that supported the Second Floor Warehouse's roof, and we use the term "Failed Truss" to refer to the specific truss that collapsed.

The rest of the roofing system was constructed atop the four trusses. Large timber beams known as "purlins" were seated at intervals upon the upper chords of the trusses, running parallel to the Building's north and south walls, and perpendicular to the trusses. (N.T. 3/17/08 at 122-23.) The Building's roof decking sat upon the timber purlins; it was constructed of wooden tongue and groove planks that ran parallel to the trusses and perpendicular to the purlins. (N.T. 3/17/08 at 125-26.)

The outer roof of the Second Floor Warehouse was constructed of several layers of built-up roofing material. (Joint Stip. ¶ 14.) The roof turned up at the eaves, thereby creating a gutter area. (Joint Stip. ¶ 15.) The gutter area sloped to drains that were connected to cast iron piping that ran through the interior of the Building. (N.T. 3/18/08 at 45, 70.) The gutter and one such drain were located on the roof directly above the end of the truss that collapsed. (Joint Stip. ¶ 27.)

### 4.      The Discovery and Repair of Roof Holes in January 2005

In January 2005, during a walkthrough of the Building, Rubin discovered holes in the roof of the Second Floor Warehouse. (Joint Stip. ¶ 20; N.T. 3/17/08 at 30; N.T. 3/18/08 at 23, 25, 27.)[7] One of the holes was located over the Failed Truss, but at its south end – that is, the end that did not

---

[7]Rubin testified that he discovered one hole in the roof. (N.T. 3/17/08 at 30.) Daniels testified, however, that more than one hole was present. (N.T. 3/18/08 at 23, 25, 27.) Rubin did not contradict this testimony and testified that he could not recall whether there were multiple holes, but stated that however many holes there were, they were all sealed. (N.T. 3/17/08 at 49.)

collapse.  (N.T. 3/18/08 at 27.)

Shortly after discovering the holes, Rubin hired contractor Clifton Joseph ("Joseph") to temporarily repair them.  (Joint Stip. ¶ 21; N.T. 3/17/08 at 30.)  Joseph did so by placing steel decking and a tarp over the area and securing the patch with wooden boards bolted to the roof.  (N.T. 3/17/08 at 48; N.T. 3/18/08 at 24-25.)  He also installed five vertical wooden pillars inside the Second Floor Warehouse under the area where one hole was discovered "[j]ust to make sure that nothing could be done until [Rubin] could get to it . . .  [S]o nothing would fall in."  (N.T. 3/17/08 at 48; N.T. 3/18/08 at 28.)  The repairs to the roof holes were intended to be temporary, and Rubin expected at some point in the future to make permanent repairs to the roof.  (N.T. 3/17/08 at 47.)

### 5.      The Discovery of the Failed Truss

On September 21, 2005, Rubin and Ivan Blitz, R.A. ("Blitz"), an architect who had worked with Rubin on various projects in the past, met at the Building for purposes of discussing a permanent repair to the Building's roof.  (Joint Stip. ¶¶ 22-23; N.T. 3/17/08 at 32, 49-51, 118, 147-48.)  When Rubin and Blitz entered the Second Floor Warehouse, they discovered that the Failed Truss had collapsed at its north end.  (Joint Stip. ¶¶ 23, 25; N.T. 3/17/08 at 32, 126.)

### B.      Disputed Factual Issues Concerning the Cause and Visibility of the Decay that Led to the Failed Truss's Collapse

While Plaintiffs and Seneca were able to agree to the background facts, the facts concerning the cause of the decay that resulted in the Failed Truss's collapse, and whether that decay was hidden, remained in dispute.  These disputed factual issues were the focus of the testimony elicited at trial.

### 1.      Plaintiffs' Evidence

Plaintiffs relied on the testimony of Rubin; Blitz; and Jody DeMarco, P.E. ("DeMarco"), a civil engineer with a specialty in structural engineering.   Rubin testified that during periodic inspections of the Second Floor Warehouse, he never noticed any decay or rot of the floor or wooden roofing system, and stated that, had he noticed such decay or rot, he would have performed the necessary repairs.  (N.T. 3/17/08 at 32-34.)

Blitz testified that the Failed Truss collapsed due to the decay and failure of its bottom chord. (N.T. 3/17/08 at 134.)  He stated that his "assumption [was] that the water came in from the outside," seeping through the brick wall and infiltrating the pocketed end of the truss, causing it to rot.  (N.T. 3/17/08 at 163-65.)  He stated that once the rot reached outside the pocket, "[t]he fibers [were] weakened and that's what caused the collapse," and that it "happened right at the masonry."  (N.T. 3/17/08 at 164-65.)  Blitz admitted, however, that he did not inspect the brick wall where the truss was sitting for evidence of water damage and that his belief that water infiltrated through the brick wall amounted to an "educated guess."  (N.T. 3/17/08 at 160-62.)[8]

_____

[8]Plaintiffs listed Blitz as an expert witness.  (Doc. 33-1 at 10.)  Seneca filed a *Daubert* motion to preclude him from offering expert testimony as to engineering or causation matters. (Doc. 28-1.)  In that the case was tried as a non-jury matter, this Court took Seneca's motion under advisement, subject to hearing testimony and argument on the motion in the context of trial.  (Doc. 36.)  At trial, Plaintiffs' counsel tendered Blitz as an expert in the field of architecture only.  (N.T. 3/17/08 at 127-28.)  Seneca's counsel objected on the ground that Plaintiffs had failed to lay a foundation for such testimony.  (*Id.*)  The Court sustained the objection, with the understanding that Plaintiffs could renew their tender of Blitz as an expert upon laying a proper foundation.  (*Id.*)  Plaintiffs declined to do so, and in light of Plaintiffs' failure to renew their tender of Blitz as an expert, we now deny Seneca's *Daubert* motion as moot.  We additionally note that Plaintiffs never at any point offered Blitz as an expert in structural engineering, nor would he qualify as one.  The question of causation in this case is a structural engineering issue, such that Blitz would not be qualified to testify to causation in any event.  We recognize that during the course of his testimony, Blitz offered what could be construed as an opinion concerning causation.  As this was a non-jury case, we heard this

DeMarco, who was qualified "as an expert in engineering with a specific expertise in structural engineering," inspected the Second Floor Warehouse on Plaintiffs' behalf in late October 2006 to determine if he could provide an opinion as to the cause of the roof collapse. (N.T. 3/17/08 at 178-79, 195.) Like Blitz, he testified that the Failed Truss collapsed because of decay of its bottom chord. (N.T. 3/17/08 at 184.) He opined that the decay was caused by water infiltration onto the pocketed end of the truss that began in the wall pocket and spread out along the bottom chord from there. (N.T. 3/17/08 at 181-84.) He testified that "water entered in some fashion" but that he could not "say with any degree of certainty whether it came from above or that it came from the side or that it came from the wall. All we know is that water entered the pocket." (N.T. 3/17/08 at 183.) He further agreed that he never made a determination as to the source of the water infiltration. (N.T. 3/17/08 at 204-06.) DeMarco concluded that the Failed Truss collapsed once the rot extended far enough into the room that the wood no longer had "the capacity to carry the load that it's intended to carry." (N.T. 3/07/08 at 181-82.)

### 2.    Seneca's Evidence

Seneca relied on the testimony of Russell Daniels, P.E., a civil engineer with a specialty in structural engineering ("Daniels"), who was qualified "to testify as an expert with respect to the . . . structural, civil engineering issues involved in the case." (N.T. 3/18/08 at 16.) Daniels inspected the Second Floor Warehouse on September 26, 2005 on Seneca's behalf to determine if he could provide an opinion as to the cause of the roof collapse. (Joint Stip. ¶¶ 33-34.)

Contrary to Blitz and DeMarco, Daniels testified that both the bottom chord and the top

---

testimony but we reject any opinion he offered concerning causation as it was beyond his expertise and not factually supported in any event.

chord of the Failed Truss rotted and collapsed.  (N.T. 3/18/08 at 75-77.)  He testified that water

leaked down from the deteriorated roof above the truss and caused it to rot from the top down in the

area of the pocketed end.  (N.T. 3/18/08 at 38-39, 46, 60-62; Ex. D112.)

Daniels explained that there was a roof drain on the roof over the rotted end of the Failed

Truss which was connected to a cast iron pipe that ran inside the Second Floor Warehouse in close

proximity to the rotted end of the truss.  (N.T. 3/18/08 at 45, 70; Exs. D100 & D112; Joint Stip. ¶

27.)  He testified that, prior to the collapse, the roof drain came to be blocked, causing water to

collect and pond on the roof.  (N.T. 3/18/08 at 23; Joint Stip. ¶ 28.)  He further testified that this

ponding water in the area of the roof drain caused the roof in that area to deteriorate allowing water

to infiltrate down through the approximate one-foot vertical space into the wooden roofing system

below and onto the Failed Truss at or near its north end as it enters the wall pocket.  (N.T. 3/18/08

at 60-62, 68-69, 88-89; Ex. D100.)

Daniels opined that water infiltration from the roof caused the wooden purlins in the

immediate vicinity of the collapsed end of the truss to rot and decay, and it also caused the Failed

Truss to rot and decay from the top down in the area near and at its pocketed end.  (N.T. 3/18/08 at

38-39, 52-54, 60-62.)  He concluded that both the decay of the wooden roofing system in the area

surrounding the collapsed end of the Failed Truss and the decay of that end of the truss itself near

and at the pocketed end were caused by the same infiltration of water through the deteriorated roof.

(N.T. 3/18/08 at 52-54, 88-89.)

Daniels stated  that "[t]he rotted portion of the roof truss may not have been readily visible,

but the roof decking above it was severely rotted and visible."  (N.T. 3/18/08 at 80.)  He further

testified that the wooden purlins located directly above the collapsed end of the Failed Truss also

showed severe rot that would have been visible prior to the collapse and that the deteriorated status of the roof and roof gutter in the area above the Failed Truss was readily visible.  (N.T. 3/18/08 at 49, 68-69, 80; Exs. D15, D100 & D111.)  Daniels explained:  "It's wood rot caused the truss to collapse.  The whole system is rotted, your roof decking's rotted, your truss is rotted, your purlin's rotted – you're trying to segregate one versus – it's a system.  They're all rotted."  (N.T. 3/18/08 at 82.)

In addition to the testimony of their own expert, Seneca pointed out that DeMarco admitted that prior to the collapse the tongue and groove planking located directly above the collapsed end of the Failed Truss had turned black from decay, the paint was peeling off of the planking, and it was rotting.  (N.T. 3/17/08 at 217, 222; Exs. D15 & D109.)  Both Blitz and DeMarco also acknowledged that there was some discoloration of the collapsed end of the Failed Truss just outside the pocket that would have been visible prior to the collapse.  (N.T. 3/17/08 at 153-54, 193.)  DeMarco conceded that this discoloration was suggestive of decay that "would need to be investigated."  (N.T. 3/17/08 at 193.)

## II.    DISCUSSION

Our ultimate decision in this case is of course predicated upon our factual findings and conclusions of law derived from these findings and informed by the legal construct within which we conducted our analysis.  We set out here that legal construct, followed by our findings of fact and conclusions of law.

### A.    Guiding Legal Principles

#### 1.    Burden of Proof

It is well settled that, in an insurance coverage case, the insured bears the burden of proving

that the damages claimed fall within the scope of coverage accorded by the policy.  *See Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996).  If this initial burden is met, the burden then shifts to the insurer to prove that an exclusion from coverage applies, such that the damages claimed are not covered.  *See Northern Ins. Co. v. Aardvark Assocs.*, 942 F.2d 189, 194 (3d Cir. 1991).

If it is shown that an exclusion applies, the insured then bears the burden of proving that an exception to the exclusion is applicable, such that the damages claimed are covered notwithstanding the exclusion.  *See, e.g., TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 915 (Pa. Commw. 2004) (construing a directors' and officers' liability insurance policy and holding that as the insurer "met its burden in establishing the applicability of the exclusion, the [insureds] bear the burden of establishing the applicability of any exception to this exclusion"); *Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, 25 F.3d 177, 180 (3d Cir. 1994) (noting, in a case concerning a general liability insurance policy, that the insured bears the burden of proving the applicability of an exception to an exclusion); *Northern Ins. Co.*, 942 F.2d at 195 (finding that the insured bears the burden of proving the applicability of the "sudden and unexpected" exception to the pollution exclusion) (*citing Lower Paxon Twp. v. U.S. Fidelity & Guaranty Co.*, 557 A.2d 393, 399 (Pa. Super. 1989)); *Farmers New Century Ins. Co. v. Angerson*, No. 4:04-cv-2608, 2008 WL 238622, *4 (M.D. Pa. Jan. 22, 2008) (construing a homeowner's insurance policy and finding that "[i]f the insurer establishes that an exclusion precludes coverage, the insured bears the burden of proving that an exception to that exclusion applies").

The parties stipulated that Plaintiffs' claimed damages were caused by "collapse."  (Joint Stip. ¶¶ 23, 26.)  The Policy provides that damages caused by collapse are excluded from coverage,

13

except when the collapse is caused by "hidden decay."  (Joint Stip. ¶¶ 30-31; Exs. D228-D229 & D232.)  Therefore, Plaintiffs, as the insureds, bear the burden of proving that the collapse was caused by hidden decay, an exception to an otherwise applicable exclusion.  *See TIG Specialty Ins. Co.*, 855 A.2d at 915; *Air Products & Chemicals, Inc.*, 25 F.3d at 180; *Northern Ins. Co.*, 942 F.2d at 195.

### 2.    Meaning of "Hidden Decay"

Insurance policies are contracts, and their construction is governed by the well-settled principles of contract interpretation.  *See TIG Specialty Ins. Co.*, 855 A.2d at 908.  A contract is to be construed according to the meaning of its language, and the role of the court in construing a contract is to ascertain and give effect to the parties' intention.  *Id.* (quotation omitted).  As the Superior Court has explained:

> When construing the written contract that embodies the terms of a policy of insurance, courts must look to the intent of the parties as expressed in the writing itself.  When the words of the insurance policy are clear and unambiguous, the intent is to be gleaned exclusively from the explicit language of the agreement.  The focus of any such interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.

*Wall Rose Mut. Ins. Co. v. Manross*, 939 A.2d 958, 962 (Pa. Super. 2007) (emphasis and citations omitted).

The term "hidden decay" is not specifically defined in the insurance policy.  In such a case, "[w]ords of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions."  *Wall Rose Mut. Ins. Co.*, 939 A.2d at 962 (*citing General Refractories Co.*, 906 A.2d at 612).  The term "hidden decay" must therefore be given its plain and ordinary meaning.  *See id.*; *see also Wurst v. State Farm Fire & Cas. Co.*, 431 F. Supp. 2d 501, 505 n.7 (D.N.J. 2006).

Other courts construing the term "hidden decay" have interpreted it to mean decay that is "not visible," "out of sight or off the beaten track; concealed," "out of sight," or "concealed." *See Wurst*, 431 F. Supp. 2d at 505 n.7; *Andrew-Riverside Presbyterian Church v. Guide-One Mut. Ins. Co.*, No. A04-1533, 2005 WL 949183, *3 (Minn. Ct. App. Apr. 26, 2005); *Olde Colonial Village Condominium Council v. Millers Mut. Ins. Co.*, No. 99C-06-187, 2002 WL 122885, *9 (Del. Super. Ct. Jan. 28, 2002); *Panorama Village Condominium Owners Ass'n Bd. of Directors v. Allstate Ins. Co.*, 26 P.3d 910, 915 (Wash. 2001). Thus, the insured must prove that the collapse was caused by decay and that the decay was hidden – or, as the authorities have made clear, "not visible" or "concealed." *See The Sandalwood Condominium Ass'n at Wildwood, Inc. v. Allstate Ins. Co.*, 294 F. Supp. 2d 1315, 1319 (M.D. Fla. 2003).

In the establishment of this element, it is not enough for the insured to simply assert that he was unaware of the decay. The test must have an objective element to it – that is to say that a reasonable insured under such circumstances would have seen or otherwise been aware of the decay. The applicable standard is that of the reasonable insured. *See id*. ("An insured must also take reasonable steps to correct damage before it undermines the structural integrity of the building."). While an insured need not affirmatively inspect the insured premises so as to uncover otherwise hidden decay and repair it before it worsens, he likewise cannot retreat to willful blindness or refusal to draw those conclusions a reasonable insured would draw from visible signs of deterioration or decay. *See Judge v. State Farm Ins. Cos.*, No. Civ. A. 92-C-03-010, 1993 WL 1611307, *3 (Del. Super. May 3, 1993) ("It is reasonable to attach the responsibility of being aware of the conditions of one's home to those areas where the damage is clearly preventable through reasonable and routine

15

maintenance or where the homeowner should be aware of the problem.").[9]

On the one hand, the presence, prior to the collapse, of visible evidence of the specific decay that caused the collapse or the visible symptoms of such decay will be sufficient to establish that the insured knew or reasonably should have known of the decay. *See Wurst*, 431 F. Supp. 2d at 505 (finding that the decay of mortar bond in a basement wall was not hidden where the wall exhibited visible evidence of cracking and the presence of salt deposits visibly evidenced water intrusion); *Andrew-Riverside Presbyterian Church*, 2005 WL 949183 at *4 (holding that the decay of the plaintiff church's walls was not hidden where there the plaintiff had longstanding prior notice of the church's structural defects). On the other hand, where there "there is generally no effective way for [the insured] to determine the existence of decay," then the insured cannot reasonably be expected to have known of the decay prior to the collapse. *See Simmons v. Allstate Ins. Co.*, No. Civ. A. 96-5112, 1997 WL 214848, *2-3 (E.D. Pa. Apr. 28, 1997).

This approach fosters the fundamental concept of insurance – that it provides coverage for fortuitous events. *See, e.g.*, *Rohm & Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1176 (Pa. 2001); *Intermetal Mexicana, S.A. v. Insurance Co. of North America*, 866 F.2d 71, 77-78 (3d Cir. 1989). "[T]he purpose of insurance is to protect insureds against unknown risks." *Rohm & Haas*, 781 A.2d at 1176. "A fortuitous event . . . is an event which *so far as the parties to the contract are aware*, is dependent on chance." *Intermetal Mexicana*, 866 F.2d at 77 (*quoting* Restatement of Contracts § 291 cmt. a) (emphasis in the original)). Collapse caused by hidden decay is fortuitous in that the risk remains unknown to the insured in that it is not visible. On the contrary, collapse

---

[9]In the absence of a reasonable insured objective test, the "hidden decay" exception could well swallow the "collapse" exclusion. The alternative, of course, is for the insured to obtain insurance that covers all forms of collapse.

caused by visible decay is not fortuitous in that the cause of the risk is visible to the insured and the degree of risk is knowable.

### B.        Findings of Fact

Based upon the testimony and evidence produced at trial, and upon our determinations of the credibility of the witnesses and evidence presented, the Court resolves the disputed factual issues concerning the cause and visibility of the decay that resulted in the collapse of the Failed Truss as follows.

### 1.        The Date of the Collapse

1.        Plaintiffs failed to establish with any precision the actual date when the Failed Truss collapsed.  Although Rubin inspected the Second Floor Warehouse at various times following the January 2005 temporary roof repair, he could not recall when or how many times he had inspected the Building during the time period from January 2005 through September 21, 2005.  (N.T. 3/17/08 at 48, 52-54, 92-93.)  He further could not recall when he had most recently visited the Second Floor Warehouse prior to discovering the collapse on September 21, 2005.  (N.T. 3/17/08 at 92.)  No further testimony or evidence concerning the date of the collapse was presented.  (N.T. 3/17/08 at 92-93.)

2.        Plaintiffs have thus established that the collapse occurred some time after January 2005 and before September 21, 2005, but are unable to establish the date of the collapse with any greater specificity.  (Joint Stip. ¶ 24.)[10]

---

[10]While this circumstance may be relevant to the conduct of Rubin as the insured, it does not otherwise affect our coverage analysis.  (*See supra* note 5.)

set above

## 2.      The Cause and Visibility of the Decay

3.      The parties agree that the Failed Truss collapsed at its north (Westmoreland Street) pocketed end due to the rotting of its wooden fibers.  (Joint Stip. ¶ 26.)  It is equally undisputed that the rotting was caused by water infiltration onto the Failed Truss over a period of many years.  (N.T. 3/17/08 at 192, 227; N.T. 3/18/08 at 92-93.)  The truss collapsed once the decay of its fibers had weakened them to the point that it could no longer bear its load.  (N.T. 3/17/08 at 181-82; N.T. 3/18/08 at 61.)

4.      The Failed Truss gave way along a one to one-and-a-half foot area, which stretched from the face of the wall out to just beyond the first bolt that secured the truss's top and bottom chords.  (N.T. 3/18/08 at 39; Exs. D114 & D133.)[11]  As Daniels credibly testified, both the bottom chord and the top chord of the Failed Truss rotted and collapsed at its north end.  (N.T. 3/18/08 at 75-77.)

5.      While Blitz and DeMarco testified to the contrary, stating that it was the bottom chord alone that collapsed and brought down the truss and part of the roof, emphasizing that the entire Failed Truss rested upon the bottom chord, we find that this testimony does not tell the complete story.  (N.T. 3/17/08 at 134, 184.)  Daniels' testimony, coupled with the photographic evidence of record, presents the more complete picture – that both the top and bottom chords of the Failed Truss

---

[11]The testimony as to the precise site of the failure does not completely match up.  Blitz testified that it failed at the wall, though he mistakenly first testified at deposition that the failure point was four to five feet out from the wall.  (N.T. 3/17/08 at 157-58.)  DeMarco testified that the truss failed in shear, as if cut by scissors, at or very close to the face of the wall.  (N.T. 3/17/08 at 180-82.)  Daniels testified that the failure occurred along the foot to foot-and-a-half section of the truss between the face of the wall and just beyond the first bolt and that this part of the truss, in effect, completely splintered and broke apart as a result of the decay and collapse. (N.T. 3/18/08 at 39, 43.)

decayed contemporaneously due to the same persistent water infiltration and that the ends of both the top and bottom chords gave way at the same time as part of a single collapse event. (*See, e.g.*, N.T. 3/18/08 at 75-77; Exs. D114 & D133; *see also* D119.)

6.      DeMarco conceded that prior to the collapse, the tongue and groove planking located directly above the collapsed end of the Failed Truss had turned black from decay, its paint was peeling off the planking, and it was rotting. (N.T. 3/17/08 at 217, 222; Exs. D15 & D109.)

7.      According to Daniels, the wooden purlins located directly above the collapsed end of the Failed Truss also showed severe rot that would have been visible prior to the collapse. (N.T. 3/18/08 at 49; Exs. D111 & D15.) Blitz and DeMarco acknowledged that there was some discoloration of the collapsed end of the Failed Truss just outside the pocket that would have been visible prior to the collapse. (N.T. 3/17/08 at 153-54, 193.) DeMarco conceded that this discoloration was suggestive of decay that "would need to be investigated." (N.T. 3/17/08 at 193.)

8.      While the testimony concerning the cause of the rotting of the Failed Truss was conflicting, we reject the causation testimony of Blitz and DeMarco, and we find Daniels' explanation to be the most persuasive and best supported explanation for the source and cause of the truss's decay, particularly in that it was best supported by the photographic evidence of record.

9.      We reject Blitz's testimony that his "assumption is that the water came in from the outside," seeping through the brick wall and infiltrating the pocketed end of the truss, causing the truss to rot and collapse once the rot reached outside the pocket. (N.T. 3/17/08 at 163-65.) Blitz admitted that he did not inspect the brick wall where the truss was sitting for evidence of water damage and that his belief that water infiltrated through the brick wall amounted to an "educated guess." (N.T. 3/17/08 at 160-62.) Moreover, Plaintiffs failed to demonstrate that Blitz, as an

19

architect and not an engineer, was qualified by knowledge, skill, experience, training, or education"
to render an opinion in this area.  *See* Fed. R. Evid. 702.[12]

10.     We also reject DeMarco's testimony that the decay was caused by water infiltration
onto the pocketed end of the Failed Truss that began in the wall pocket and spread out along the
bottom chord from there.  (N.T. 3/17/08 at 181-84.)  DeMarco's testimony was equivocal on this
point.  He testified that "water entered in some fashion" but that he could not "say with any degree
of certainty whether it came from above or that it came from the side or that it came from the wall
. . . [a]ll we know is that water entered the pocket," and he (N.T. 3/17/08 at 183.)  He further agreed
that he never made a determination as to the source of the water infiltration.  (N.T. 3/17/08 at 183,
204-06.)

11.     As Daniels credibly testified, water leaked down from the deteriorated roof above the
Failed Truss and caused the truss to rot from the top down in the area of and into the pocketed end.
(N.T. 3/18/08 at 38-39, 46, 60-62; Ex. D112.)  A roof drain was located on the roof over the rotted
end of the truss.  (Joint Stip. ¶ 27.)  The roof drain over the truss was connected to a cast iron pipe
that ran inside the Second Floor Warehouse in close proximity to the rotted end of the truss.  (N.T.
3/18/08 at 45, 70.)  The drains moreover were not covered by drain guards or cages, as is standard
industry practice.  (N.T. 3/18/08 at 23.)

12.     Prior to the collapse, the roof drain over the rotted end of the Failed Truss was
blocked, causing water to collect and pond on the roof.  (Joint Stip. ¶ 28; N.T. 3/18/08 at 23.)  The
ponding water in the area of the roof drain caused the roof in that area to deteriorate and allowed
water to infiltrate down through the approximately one-foot vertical space from the roof down into

---

[12]*See also* note 8, *supra*.

the wooden roofing system and onto the truss at or near the end section and into the pocketed end. (N.T. 3/18/08 at 60-62, 68-69, 88-89; Ex. D100.) Water infiltration from the roof caused the wooden purlin beams in the immediate vicinity of the collapsed end of the truss to rot and decay, and it also caused the truss to rot and decay from the top down in the area near and in its pocketed end. (N.T. 3/18/08 at 38-39, 52-54, 60-62.)

      13.    Both the decay of the wooden roofing system in the area surrounding the collapsed end of the Failed Truss and the decay of that end of the truss itself were caused by the same persistent infiltration of water through the deteriorated roof which caused systemic decay in that area. (N.T. 3/18/08 at 52-54, 88-89.) As Daniels testified, "[t]he rotted portion of the roof truss may not have been readily visible, but the roof decking above it was severely rotted and visible." (N.T. 3/18/08 at 80.) As he further testified, the wooden purlins located directly above the collapsed end of the truss also showed severe rot that would have been visible prior to the collapse and that the deteriorated status of the roof and roof gutter in the area above the truss was readily visible. (N.T. 3/18/08 at 49, 68-69, 80.) This testimony was supported by the photographic evidence of record, which demonstrated the roof deterioration and rotting of the beam and purlin in the area of the Failed Truss. (Exs. D15, D100, D111.)

      14.    As Daniels concluded and we accept: "It's wood rot caused the truss to collapse. The whole system is rotted, your roof decking's rotted, your truss is rotted, your purlin's rotted – you're trying to segregate one versus – it's a system. They're all rotted." (N.T. 3/18/08 at 82.)

### 3.    Inspection and Maintenance of the Second Floor Warehouse

15.    Prior to the collapse, the undersides of the trusses, purlins, and roof decking were generally visible from inside the Second Floor Warehouse.  (*See, e.g.*, N.T. 3/17/08 at 169-70; N.T. 3/18/08 at 90.)  The end sections of the trusses, which sat in the pockets, however, were not visible from inside the Building.  (Joint Stip. ¶ 13.)

16.    The Second Floor Warehouse was reasonably well-lit by two rows of fluorescent lights hanging from the ceiling.  Although some testimony suggested that the lights hung from the trusses themselves, which would have limited visibility of the trusses, we find, based on the testimony and in large part on the photographic evidence, that the lights hung from the purlins, above the level of the bottom chords of the trusses and therefore did not obstruct views of the trusses. (N.T. 3/17/08 at 169-72; N.T. 3/18/08 at 56-57; Exs. D88, D90, D108.)

17.    Rubin was the only person to inspect the Building on behalf of Plaintiffs, and his inspections of the Second Floor Warehouse were perfunctory at best.  (N.T. 3/17/08 at 53.)  He did not conduct inspections on any particular established schedule; he testified "I don't know" when asked how often the inspections occurred.  (N.T. 3/17/08 at 52-54.)  When he inspected the Second Floor Warehouse, he would examine the floor for evidence of any water intrusion, but he would not inspect the ceiling.  (N.T. 3/17/08 at 54.)

18.    Rubin did not perform any maintenance on the roof over the Second Floor Warehouse from the time he inherited the Building in 1996, except for the temporary repair of the holes discovered in January 2005.  (N.T. 3/17/08 at 43.)  He further had no recollection or knowledge of maintenance performed by his father before 1996.  (*Id.*)  Moreover, while he intended the January 2005 repairs to be temporary, he failed to effectuate permanent repairs in a proper manner between

January 2005 and the September 21, 2005 discovery of the collapse.  Further, he gives no credible

reason why he or anyone acting on his behalf could not have effectuated permanent repairs.  (N.T.

3/17/08 at 47.)

19.     Rubin never personally inspected the drains on the roof of the Second Floor

Warehouse.  (N.T. 3/17/08 at 43-45; *see also* Joint Stip. ¶ 18.)  Although he stated that he believed

that he would have had debris removed from the roof from time-to-time, the presence of significant

debris on the roof and deterioration of the roof membrane make it clear that the roof was seldom, if

ever, inspected or cleaned.  (N.T. 3/17/08 at 43-45.)  Rubin also has no documentation to show that

his father ever performed maintenance to the roof of the Second Floor Warehouse.  (Joint Stip. ¶ 19.)

20.     Prior to the collapse, widespread areas of the wooden roofing system were in a visible

state of rot and decay.  (N.T. 3/17/08 at 199; N.T. 3/18/08 at 28, 31-32, 34.)  The post-collapse

photographic evidence further demonstrates this widespread decay.  (Exs. D88-D99, D92-D93.) For

example, in the areas near one of the holes in the roof that were patched in January 2005, the

photographic evidence shows a rotted, broken purlin laying on the floor, a broken purlin hanging

from the roof, a visibly darkened area of the roof decking that was rotted, and holes in the floor.

(N.T. 3/18/08 at 28, 31-32, 34; Exs. D88-D89, D92-D93.)

21.     We find partially credible Rubin's testimony that he never noticed any decay or rot

of the floor or wooden roofing system, and that, had he noticed such decay or rot, he would have

performed the necessary repairs.  (N.T. 3/17/08 at 32-34.)  However, we are at a loss to understand

how he could have failed to notice the significant and widespread decay prevalent throughout the

Second Floor Warehouse.  Accordingly, we conclude that his periodic inspections were grossly

insufficient.

22.     As permitted under the Policy, Seneca also had the Building inspected from time-to-time. (N.T. 3/17/08 at 27-29, 64-67, 80-82, 88-91, 109-13.)  The evidence did not establish the exact nature or timing of such inspections, but it did establish that such inspections were performed approximately once a year and that they lasted for around one to one-and-a-half hours.  (*Id.*)

23.     The evidence further established that if Seneca's inspectors identified any problems or deficiencies in a building they inspected, it would send written notice of the deficiencies and require that they be corrected, while reserving the right to cancel the coverage if the deficiencies were not corrected.  (N.T. 3/17/08 at 80-82, 89-90.)  While Rubin received deficiency notices relating to other properties he owned that were insured by Seneca, no such notices were ever presented with respect to the Building or Second Floor Warehouse.  (N.T. 3/17/08 at 82.)  Seneca's Policy, however, notes that its inspections and recommendations "relate only to insurability and the premiums to be charged" and were not conducted for other purposes, including identifying hidden decay.  (Ex. D224.)

### C.     Conclusions of Law

Based on our factual findings and the applicable law, we make the following conclusions of law:

1.     Because the parties stipulated that Plaintiffs' damages were caused by collapse, an excluded peril under the Policy, Plaintiffs bear the burden to establish that the loss was caused by "hidden decay" within the meaning of the Policy's exception to the "collapse" exclusion.  *See, e.g.*, *TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 915 (Pa. Commw. 2004); *Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, 25 F.3d 177, 180 (3d Cir. 1994); *Northern Ins. Co. v. Aardvark Assocs.*, 942 F.2d 189, 195 (3d Cir. 1991); *Farmers New Century Ins. Co. v. Angerson*,

24

No. 4:04-cv-2608, 2008 WL 238622, *4 (M.D. Pa. Jan. 22, 2008).

2.      "Hidden decay" means decay that is "not visible" or "out of sight."  To be "hidden decay" within the meaning of the Policy, Plaintiffs must have neither actual nor constructive knowledge of the decay.  *See Wurst v. State Farm Fire & Cas. Co.*, 431 F. Supp. 2d 501, 505 n.7 (D.N.J. 2006); *Andrew-Riverside Presbyterian Church v. Guide-One Mut. Ins. Co.*, No. A04-1533, 2005 WL 949183, *3 (Minn. Ct. App. Apr. 26, 2005); *Olde Colonial Village Condominium Council v. Millers Mut. Ins. Co.*, No. 99C-06-187, 2002 WL 122885, *9 (Del. Super. Ct. Jan. 28, 2002); *Panorama Village Condominium Owners Ass'n Bd. of Directors v. Allstate Ins. Co.*, 26 P.3d 910, 915 (Wash. 2001); *The Sandalwood Condominium Ass'n at Wildwood, Inc. v. Allstate Ins. Co.*, 294 F. Supp. 2d 1315, 1319 (M.D. Fla. 2003).

3.      The systemic decay of the roofing system in the vicinity of the north end of the Failed Truss, which included the truss, the purlins, and the tongue and groove planking in the area, was visible from inside the Second Floor Warehouse prior to the collapse.  (Findings of Fact ["FF"] 7, 13-16, 20.)

4.      Because the decay was visible, it was not "hidden" within the meaning of the Policy. (FF 7, 13-16, 20.)

5.      Regardless of whether Plaintiffs had actual knowledge of the decay, (FF 17-19, 21), a reasonable insured under the circumstances would have known of it because the decay was readily visible. (FF 7, 13-16, 20.)

6.      Plaintiffs' damages were not caused by "hidden decay" within the meaning of the Policy's exception to the "collapse" exclusion, but rather were excluded from coverage under the "collapse" exclusion.

**IV.     CONCLUSIONS**

Based on our findings of fact, conclusions of law, and supporting discussion and analysis, we find that Plaintiffs failed to meet their burden of proving that the collapse of the roof portion of the Second Floor Warehouse was caused by hidden decay.  Because we find in Seneca's favor, Plaintiffs' motion at the close of evidence for judgment as a matter of law (mischaracterized as a Rule 50 motion) is denied.  (N.T. 3/18/08 at 104.)

An appropriate Judgment Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| S.R.P. MANAGEMENT CORP. et al. | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | NO.  06-935 |
| | : | |
| SENECA INSURANCE COMPANY | : | |
| | : | |
| Defendant | : | |

**JUDGMENT ORDER**

AND NOW, this 13th day of May, 2008, it is hereby **ORDERED** that **JUDGMENT** on

Plaintiffs' claim for insurance coverage is entered in favor of defendant Seneca Insurance Company

("Seneca") and against Plaintiffs S.R.P. Management Corp. and Nibur Westmoreland, Inc.  It is

further **ORDERED** that Plaintiffs' motion at the close of evidence for judgment as a matter of law

(mischaracterized as a Rule 50 motion) is **DENIED** and that Seneca's Motion *in Limine* to Preclude

Testimony of Plaintiffs' Proposed Liability Expert, Ivan I. Blitz (Doc. 28) is **DENIED AS MOOT**.

BY THE COURT:

/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
United States Magistrate Judge